Application of Melton T. PEARSON.
Patent Appeal No. 9226.

United States Court of Customs
and Patent Appeals.
April 25, 1974.

Geoffrey R. Myers, Bethesda, Md. (Moore & Hall, Washington, D. C.) attorney of record, for appellant.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; Fred E. McKelvey, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, RICH, MILLER and LANE, Judges, and ALMOND, Senior Judge.

ALMOND, Senior Judge.

Appellant brings this appeal from a decision of the Patent Office Board of Appeals that affirmed the examiner's rejection of claims 59–79 and 83–86 in his application [1] entitled "Novel Compositions and Methods of Use." The parties have submitted the case on the record and briefs. We affirm in part and reverse in part.

### The Invention

Appellant's invention relates to a composition and its use to inhibit the formation of "pops" and "unsound kernels" during the growth of a peanut crop. According to the record, the term "pops" refers to peanut shells in which no peanut has developed at maturity. By contrast, the term "unsound kernel" is used to describe the condition in which the peanuts that do develop within the shell are small and malformed. An extensive occurrence of either defect significantly reduces the value of a peanut crop.

An adequate summary of the prior art method for avoiding pops and unsound kernels is set forth in the following extract from appellant's specification:

Although the exact biological reason for the formation of "pops" and unsound kernels is not known at the present time, it was known as early as 1800 that if the earth surrounding a peanut plant is treated with some form of calcium-containing compound the problem of "pop" and unsound kernel formation could be materially reduced. In recent years this land treatment has been refined to a highly sophisticated degree. Such a treatment is currently referred to by those in the industry as landplastering. Landplastering as used today consists of spreading large quantities of an inorganic calcium salt (e.g. CaO, $CaCO_3$ and preferably $CaSO_4$) on the ground surrounding the peanut plant. Experts in the use of this landplaster technique advocate the criticality of both the time and place at which the calcium salt must be applied if the technique is to be effective. Generally speaking, current expert opinion is that to be at least operative and at best, effective, the calcium salt must be applied at early bloom to the soil at the base of the plant in order to insure that calcium is present at the points of pegging when it occurs. This is usually accomplished by applying a 16-inch band of the salt to the soil centered over the plant row. As is well known, "pegging" is a term used in the peanut industry to describe that process which occurs wherein the bloom-shoots of a peanut plant bend downward from their basically upright position and seek entry into the earth to thereby form "pegs" in the earth from which peanut pods will grow. Although such landplaster techniques have proved useful in diminishing the problem of "pop" and unsound kernel formation, they do require the use of large quantities of the calcium salt and thus result in high costs. For example, it has been found that in most peanut producing areas, about 500 to 1000 lbs. per acre of the preferred compound gypsum (commercially available $CaSO_4$, having particle sizes of about 100 to 200 microns), must be applied to the soil in order to substantially eliminate the formation of "pops" and unsound kernels by landplaster techniques. For most other calcium salts equal or greater amounts per acre are required to achieve the same results.

---

I. Serial No. 801,855 filed February 24, 1969 as a continuation-in-part of application Serial No. 748,217 filed July 29, 1968.

Appellant's invention, which also involves the use of calcium compounds to reduce the occurrence of pops and unsound kernels, is summarized in the specification as follows:

The basic composition as contemplated by this invention is comprised of a calcium-containing compound of reduced particle size. By reduced particle size is meant, particles having a size of about 20 microns or less, preferably of submicron size. Such basic compositions may be in dust, powder, slurry, or other conventional form. Preferably such compositions also include fungicides, insecticides, herbicides, and mixtures thereof.

The novel techniques as contemplated by this invention generally comprise contacting the foliage of a peanut crop with the above described compositions to thereby reduce the number of "pops" and unsound kernels formed in a particular peanut crop. In most instances, from about 15 to about 80 pounds per acre of a calcium-containing compound having a particle size of about 20 microns or less, preferably of about 2 microns or less, and most preferably of sub-micron size, and preferably from 20 to 75 pounds per acre, are all that is necessary to apply to the foliage of a peanut crop in order to substantially eliminate the problem of "pops" and unsound kernels.

According to the specification, the preferred calcium compound is calcium sulfate ($CaSO_4$), especially in the form of its naturally occurring dihydrate ($CaSO_4.2H_2O$) known as gypsum.

Composition claim 59 and method claim 75, both of which are reproduced below, are representative of the claims on appeal.

59. An anti-pop and unsound kernel peanut foliage preparation for reducing pops and unsound kernels in peanut plants comprising, as an active ingredient, a calcium-containing compound of a sufficiently small particle size which when applied to the foliage of a peanut crop will substantially reduce the formation of pops and unsound kernels.

75. A method of treating a peanut crop comprising applying to the foliage of said peanut crop a sufficient amount of a composition comprised of, as an active ingredient, a calcium-containing compound having a sufficiently small particle size to substantially reduce the formation of pops and unsound kernels.

The remaining composition claims add one or more limitations. These limitations include requirements that the calcium compound be $CaSO_4$ and that the average particle size be less than 20 microns, or even submicron (less than 1 micron) in size. Other limitations require that the composition include a glycol ether, lignin sulfonate or a fungicide and that the composition have sufficient calcium compound so that it can be applied at the rate of 15–80 pounds per acre.

The method claims closely parallel the composition claims in format in that they specify foliage treatment with a composition generally as set forth in the composition claims. Two of these claims, 84 and 85, require separate consideration. Claim 84 is directed to a method wherein the composition used contains a fungicide.

Claim 85 stands in a somewhat different posture in that it is an attempt to define a method of treatment as an improvement to the conventional landplastering process described supra. Claim 85 reads as follows:

85. In the method of treating a peanut plant by applying to the soil at the point of pegging, a layer of a calcium-containing compound, the improvement which comprises, the additional application, but to the foliage of said peanut plant, of a composition containing, as an active ingredient, a calcium-containing compound having a particle size less than about 20 microns such that, upon the application of said active ingredient to the surfaces of the foliage of the peanut plant, said active ingredient is intro-

duced into the structure of said plant, the combined application both to the soil and to the surfaces of the foliage of the peanut plant being in an amount and at a rate per acre of said crop sufficient to reduce the formation of peanut pops and unsound kernels in the peanuts yielded by said crop.

The board reversed the examiner's rejection of method claims which call for applying to the peanut plant a composition wherein either a glycol ether or lignin sulfonate is used in combination with the calcium compound.

### Opinion

The examiner's rejection of the claims in issue finds its statutory basis in 35 U.S.C. § 103. However, the board interpreted the examiner's reasoning, accurately we think, as setting forth as one ground for the rejection that the claims did not define novel subject matter. The board affirmed the rejection on this ground.

Of course, a rejection such as that sustained by the board would normally be based upon one of the applicable subsections of 35 U.S.C. § 102. However, this court has sanctioned the practice of nominally basing rejections on § 103 when, in fact, the actual ground of rejection is that the claims are anticipated by the prior art. See In re Dailey, 479 F.2d 1398 (Cust. & Pat.App. 1973). The justification for this sanction is that a lack of novelty in the claimed subject matter, e.g., as evidenced by a complete disclosure of the invention in the prior art, is the "ultimate or epitome of obviousness." In re Kalm, 378 F.2d 959, 962, 54 CCPA 1466, 1470 (1967).[2]

The solicitor suggests that we resolve this case by first determining whether the claims define novel subject matter and, if one or more do, then determine whether unobvious subject matter is set forth.[3] In order to facilitate our discussion of these questions, we shall separately consider the merits of the rejection as applied to the composition and method claims.

### The Composition Claims

The board interpreted the composition claims as reading on compositions that include a calcium compound of small particle size and held that such compositions were described in the prior art. The prior art of record applied against these claims consists of several British patents and a portion of Kirk-Othmer, Encyclopedia of Chemical Technology, John Wiley and Sons, N.Y. (1964). There is no need to discuss this prior art in view of the following admission by appellant and summary of his position taken from his brief before the board and main brief in support of this appeal:

Applicant readily admits that calcium containing compounds have been ground to particle sizes within the range of even his preferred peanut foliage preparation and that such compounds have often been employed in combination with insecticides, lignin sulphonate and/or glycol ethers. Despite this admission, applicant respectfully submits that, as a matter of law, one cannot ignore the remainder of the limitations in the claims, which limitations render the claims clearly patentable over the art.

In view of this admission, the board considered the claims to be fully met by the prior art. The board reasoned, despite appellant's assertions to the contrary, that terms in the claims such as "for reducing pops and unsound kernels

---

2. The record establishes that appellant was fully aware of the *ground* of rejection being put forth regardless of its *statutory basis*. Furthermore, the board, in affirming the rejection under § 103, did not in effect make a new rejection under § 102 as occurred in In re Echerd, 471 F.2d 632 (Cust. & Pat. App.1973).

3. Of course, if the *only* ground for the rejection made under § 103 is that the claims are anticipated, it would be improper to consider arguments directed to showing that the claimed subject matter would have been obvious were we to reverse the ground of rejection actually made. In re Wiggins, 488 F.2d 538 (Cust. & Pat.App.1973).

in peanut plants," and "when applied * * * will substantially reduce the formation of pops and unsound kernels," do not provide limitations by which the claimed composition is distinguished from those known to the prior art. On this appeal, appellant continues to assert that these and similar terms are limitations which define a novel composition. We disagree.

These terms merely set forth the intended use for, or a property inherent in, an otherwise old composition. As the board pointed out, such terms do not differentiate the claimed composition from those known to the prior art. See Kropa v. Robie, 187 F.2d 150, 38 CCPA 858 (1951); In re Lemin, 326 F.2d 437 51 CCPA 942 (1964), and In re Zierden, 411 F.2d 1325, 56 CCPA 1223 (1969).

It seems quite clear to us that one of the compositions admitted to be old by the appellant would not undergo a metamorphosis to a new composition by labeling its container to show that it is a composition suitable for treating peanuts to avoid the formation of pops and unsound kernels. See In re Lemin, supra. The container would still contain the old composition.

We do not mean to imply that terms which recite the intended use or a property of a composition can never be used to distinguish a new from an old composition. However, assuming their compliance with the definiteness requirement of the second paragraph of 35 U.S.C. § 112, such terms must define, indirectly at least, some characteristic not found in the old composition. For example, if calcium compounds of very small particle size had not been known to the prior art, then a term defining the particle as being of a size which "when applied to the foliage of a peanut crop will substantially reduce the formation of pops and unsound kernels" might be capable of distinguishing the new composition from the old.

However, as pointed out above, calcium compositions of small particle size containing the types of additives claimed by appellant were known to the prior art. Accordingly, we will affirm the board's decision relative to composition claims 59–74.

## The Method Claims

The essence of the board's reasoning in sustaining the rejection of method claims 75–79, 83, 85 and 86 is that, in its view, the claimed process is inherent in the prior art landplastering process. Claim 84 was treated somewhat differently by the board and will be discussed infra.

The board's conclusion regarding the inherency of the claimed process was based upon two factual determinations with which we are in full agreement. Firstly, it observed, from evidence submitted by appellant, that conventional landplastering compositions typically contain a high percentage (in most cases around 50%) of the calcium compound having a particle size of less than 24 microns. It will be recalled that appellant's specification states that particles of about 20 microns or less are effective in his invention. In one instance, the prior art composition contained nearly 40% of particles of 10 microns or less.

Secondly, the board observed that, in the landplastering process as taught by the prior art, the calcium compound was applied over the leaves of the peanut plant even though the objective was to have as much of it as possible fall to the ground.

In view of these facts, the board correctly concluded that the prior art landplastering process would result in the application to peanut foliage of a calcium compound having a particle size of 20 microns or less. In this regard we think it worth noting, as did the board, that the claims are not written in a way that would exclude the use of a calcium-containing composition having relatively large particles in addition to particles of less than 20 microns in size.

Accordingly, we will affirm the board's decision insofar as it applied to method claims 75, 77, 78, 79 and 85. It may very well be that appellant has made a patentable invention. However,

in our view these claims are so broadly written as to read upon the prior art landplastering process. In reaching this decision we have considered the argument made by appellant that claim 85 is intended to read upon a process whereby a foliar application of a calcium composition of small particle size is made subsequent to a conventional landplastering operation. However, we agree with the board that this is but one possible interpretation and that claim 85 can be interpreted as calling for a simultaneous application of a calcium composition to the ground and leaf of the peanut plant and as such reads on the landplastering process.

During the prosecution of a patent application, claims are to be given the broadest reasonable interpretation. See In re Prater, 415 F.2d 1393, 56 CCPA 1381 (1969) and In re Finsterwalder, 436 F.2d 1028, 58 CCPA 871 (1971).

We do not agree with the board's decision that claims 76, 83 and 86 define peanut treating processes that are inherent in the landplastering process. Each of these claims defines a process using a calcium composition having particles submicron (less than 1 micron) in size. However, the evidence of record relating to the particle size of compositions sold for use in landplastering operations shows that none of those compositions analyzed contained particles less than 1 micron in size. Furthermore, even though the record does establish that calcium compounds of less than 1 micron in size were known to the prior art, it in no way indicates that these compositions were used to treat peanut plants.

For his part, the solicitor urges that the subject matter of these claims, if not anticipated, would have been obvious. His reasoning is that:

The examiner held * * * that it would be obvious to determine the optimum particle size. * * * Inasmuch as calcium compounds having a wide variety of particle sizes have been used for appellant's purpose and calcium compounds of submicron size are old, it would be *prima facie* obvious to use calcium compounds of submicron size for appellant's purpose.

There is no objective evidence, as noted by the examiner, comparing the use of calcium compounds having particle sizes of greater than one micron with those of less than one micron. It follows that appellant has failed to overcome the *prima facie* case of obviousness made out by the examiner.

We do not agree with the solicitor that the board should be affirmed for these reasons. In our opinion the alleged prima facie case of obviousness was never established. The optimization of particle size would necessarily have been in regard to the landplastering process as known to the art. Of course, the object there would have been to get as much calcium compound as possible on the soil, since the record establishes that it was thought that the calcium had to be taken into the peanut plant from the soil.

Bearing in mind these prior art teachings, we agree with appellant that one skilled in the art would, if anything, go to a larger particle size in order to limit retention on the leaf during the landplastering operation. Accordingly, it was not necessary that appellant present evidence of unexpected results or other facts which might serve to rebut a prima facie case of obviousness. Therefore, the rejection of claims 76, 83 and 86 is reversed.

Claim 84 was not considered by the board to be inherent in the prior art landplastering process. Instead, the board acknowledged that a combination of a calcium composition and a fungicide was not directly taught in the art relied upon by the examiner. However, the board did take notice of the " * * * widespread use of soil fungicides * * * " and held that it would be at least prima facie obvious to apply such a fungicide with a calcium composition during a landplastering operation.

Appellant does not argue that the notice by the board was improper,

but urges that the board erred in its conclusion that to use a fungicide in the landplastering operation would be obvious. The argument put forth in the brief in support of this assertion seems to be premised on the notion that the only fungus to which peanut plants are susceptible is a leaf fungus, called leaf spot. Therefore, to admix fungicide with the calcium composition used in landplastering would, in appellant's view, be a great waste of fungicide since most of it would end up on the ground.

The fatal defect in this argument is that there is no competent evidence which would negate the board's conclusion that the elimination of *soil* fungi could be the object of one skilled in the art rather than a *leaf* fungus. Attorney's argument in a brief cannot take the place of evidence. In re Cole, 326 F.2d 769, 51 CCPA 919 (1964). For this reason, the rejection of claim 84 is affirmed.

In summary, the rejection of claims 59–75, 77–79, 84 and 85 is affirmed. The rejection of claims 76, 83 and 86 is reversed.

Modified.